**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**ANDREW E. HUNT,**

      **Petitioner,**

                                   **Case No. 2:15-cv-2377**
      **v.**                           **JUDGE GEORGE C. SMITH**
                                     **Magistrate Judge King**

**WARDEN, LEBANON
CORRECTIONAL INSTITUTION,**

      **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the *Petition* (ECF No. 1), Respondent's *Return of Writ* (ECF No. 5), Petitioner's *Reply* (ECF No. 12), and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

### Facts and Procedural History

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> On May 24, 2012, appellant was indicted for one count of murder in violation of R.C. 2903.02 and one count of having a weapon while under disability ("WUD") in violation of R.C. 2923.13. The murder count included specifications for use of a firearm and discharging a firearm from a motor vehicle, as well as a specification alleging appellant was a repeat violent offender ("RVO") based on a 1997 felonious assault conviction. The indicted charges arose out of the May 16, 2012 shooting death of James Daniel Canty. Appellant waived his right to a jury trial on the WUD charge, and the matter proceeded to trial where the following evidence was adduced.
>
> Columbus Police Officer Brian Smith responded to Vida Place shortly before 4:00 a.m., on May 16, 2012, on the report of a

shooting. When Officer Smith arrived, he saw Canty laying on the ground and a gentleman holding a towel on Canty's neck in an effort to stop the bleeding. A witness told Officer Smith the shooter was in a "Chevrolet Tahoe, silver in color with dark tinted windows." (Tr. 37.) Medics responded and Canty was pronounced dead at the scene.

Testimony was also presented from Alexis Lewis, who, upon her release from jail in January 2012, began residing with Ashley Morrison at 2734 Vida Place. According to Lewis, Canty, also known as "Dan Dan," lived next door to them. At 1:00 a.m. on May 16, 2012, Lewis, Morrison, John McCreary, and Andrea Finley were at 2734 Vida Place, and, according to Lewis, appellant arrived at approximately 2:30 a.m. Lewis described appellant as acting "[o]bnoxious, demanding, kind of like in charge," causing Lewis to ask appellant to leave. (Tr. 74.) Lewis testified appellant left without incident, and Lewis went into the kitchen. Lewis then heard a conversation outside causing her to open the front door. Through the screen door, Lewis saw appellant and Canty in the middle of the street. Lewis testified as follows:

And they talked for a second in the middle of the street. And [appellant] started walking to his truck and [Canty] followed.

And [appellant] got in his truck and rolled the window down. And [Canty] was standing right up next to his truck and they talked for a second. The conversation must have ended. [Canty] turned around to walk away. And [appellant] must have said "Dan" or something. He turned around, and that's when he started shooting him.

Q. What did you see next?

A. [Canty] tried to run away and he fell face first on the ground.

(Tr. 75–76.)

Lewis called 9–1–1, and another neighbor ran out to help Canty. Lewis was interviewed by police on three occasions. The first interview occurred at the scene just after the shooting. At that time, Lewis told police she heard five or six shots and saw a light-colored SUV leaving the scene, but she did not see anything else because she was in the kitchen making a sandwich when the shooting happened. The second interview was at police headquarters at approximately 7:30 a.m. on May 16. At this time, Lewis named appellant as the shooter, provided a physical

description of him, and selected him out of a photo array. Lewis testified at trial that she was not forthcoming about all the details of the shooting at this time. The third interview also occurred on May 16, and at this interview, Lewis again indicated appellant was the shooter. Lewis's trial testimony was similar to the full description of events she provided police at this third interview. At trial, Lewis testified she lied and was not fully forthcoming with police because she was afraid for her safety and that of her family.

Nathaniel Sims, Jr., testified he was on the couch listening to music in the early morning hours of May 16, 2012 when he heard four gunshots. When he looked out the window, Sims saw the driver of a truck roll up the window and "skirt[ ] out" of the area. (Tr. 450.) Sims described the truck as a 2003 gray Tahoe. After the truck left, Sims testified he ran outside where the victim was laying on the ground bleeding. Therefore, Sims took off his shirt and handed it to another man who was attempting to stop the bleeding.

As a result of the information obtained throughout the morning, an arrest warrant was issued for appellant. Appellant was arrested at his address, 483 South Ogden, at approximately 10:30 a.m. on May 16. Appellant told police he lived at 483 South Ogden with his mother and stepfather. During his interview with police, appellant denied having anything to do with Canty's death.

Columbus Police Detective Glen Siniff testified a search warrant was executed at 483 South Ogden shortly after appellant's arrest. A box containing marijuana and some pills, $9,000 in cash, and several pieces of gold jewelry were found in a bedroom. A 2003 gold Chevrolet Tahoe, titled to appellant, was parked in the back of the residence. Detective Siniff testified that, though the vehicle looked as if it had been cleaned, he noticed a small spot on the driver's side door of what appeared to be blood. The spot was tested, and the vehicle was impounded.

Testing of the spot concluded it was blood. The DNA profile extracted from the blood was consistent with Canty's DNA. Several fingerprints were taken from the vehicle but only two were identified. Three of the six fingerprint lifts taken from the vehicle matched either appellant or a man named Tony Marcum. The remaining fingerprints lifts were not able to be identified. A search of the vehicle revealed a bucket containing cleaning supplies and rags. Additionally, the driver's side visor had several spots that tested presumptive positive for blood but from which no DNA profiles could be extracted.

Allie Hunt, appellant's mother, testified that, at approximately 11:00 p.m. on May 15, appellant left in a truck to pick up a mattress and box springs, but that he was not driving the Tahoe when he left. Hunt could not recall what time appellant returned, but that he did so to unload the mattress and box springs and then left again to return the truck. Hunt testified the Tahoe was parked in the back of the residence at 1:40 a.m., and she believed appellant was home at that time. Hunt did not see appellant until the next morning at approximately 9:30 a.m. and nothing was out of the ordinary. Hunt also testified the money found in the house belongs to her and her husband. According to Hunt, they had been saving that money over seven years for home repairs and to get the roof fixed. Hunt also testified the marijuana and pills found at the house belonged to her husband.

The jury returned a verdict of guilty on the murder charge, as well as the specifications for use of a firearm and discharging a firearm from a motor vehicle. Thereafter, the trial court found appellant guilty of WUD and the RVO specification. A sentencing hearing was held, and appellant was sentenced to an aggregate prison term of 31 years to life. A judgment reflecting the same was filed on November 16, 2012.

## II. ASSIGNMENTS OF ERROR

In a timely appeal, appellant presents seven assignments of error for our consideration:

[I.] Misconduct and overreaching by the prosecutor deprived Defendant–Appellant of a fundamentally fair trial and reliable jury verdict in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

[II.] The trial court committed reversible error when it denied Defendant–Appellant's motion to suppress evidence that was seized from his motor vehicle in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

[III] The cumulative effect of the trial court's erroneous evidentiary and procedural rulings deprived Defendant–Appellant of his due process right to a fundamentally fair jury trial under the Sixth and Fourteenth Amendments to the U.S. Constitution.

[IV.] The trial court's reception of new evidence to support the prior conviction elements of the weapon under disability count and

4

the repeat violent offender specification after the trial court already terminated violated [sic] Defendant–Appellant's rights under the Double Jeopardy Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

[V.] Defendant–Appellant's convictions for murder and having a weapon under disability are against the manifest weight of the evidence.

[VI.] The jury's affirmative finding that Defendant–Appellant committed the offense of murder by discharging a firearm from a motor vehic[l]e is not supported by evidence sufficient to satisfy the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

[VII.] Defendant–Appellant was denied his right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

*State v. Hunt*, No. 12AP-103, 2013 WL 6406316, at *1-3 (Ohio App. 10th Dist. Dec. 5, 2013). On December 5, 2013, the appellate court affirmed the judgment of the trial court. *Id*. Petitioner filed a motion for reconsideration and to certify conflict. (ECF 5-1, PageID# 291.) On January 30, 2014, the appellate court denied Petitioner's motions. *Id.* (PageID# 332.) On June 11, 2014, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Hunt*, 139 Ohio St.3d 1417 (2014).

On June 9, 2015, Petitioner filed the *Petition*. He claims that he was denied a fair trial because of prosecutorial misconduct (claim one); that the evidence is constitutionally insufficient to sustain his conviction on the drive-by shooting specification (claim two); that he was denied the effective assistance of trial counsel (claim three); that reception of new evidence after trial violated his rights under the Double Jeopardy Clause (claim four); and that the unauthorized substitution of an alternate juror denied him his right to have his trial completed by a particular tribunal (claim five). Respondent contends that Petitioner's claims are procedurally defaulted or without merit.

5

**Procedural Default**

State prisoners who are in custody in violation of the Constitution or laws or treaties of the United States may apply to the federal courts for a writ of habeas corpus. 28 U.S.C. § 2254(a). In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, however, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims must first present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present his federal claims, then his petition is subject to dismissal for failure to exhaust state remedies. *Id.*; *Anderson v. Harless*, 459 U.S. 4, 6 (1982 (*per curiam* ) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)). Where a petitioner has failed to exhaust his claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas. . . ." *Coleman* v. *Thompson*, 501 U.S. 722, 735 n. 1 (1991).

The term "procedural default" has come to describe the situation where a person convicted of a crime in a state court fails (for whatever reason) to present a particular claim to the highest court of the State so that the State has a fair chance to correct any errors made in the course of the trial or the appeal before a federal court intervenes in the state criminal process. This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review." *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)). In order to "fairly present" a federal claim to the state courts, a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal claims being asserted. If a federal claim is not presented to the state courts in the way required by state law and if, because of such failure, the

state courts do not decide the claim on its merits, then neither may a federal court do so. "[C]ontentions of federal law which were not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case - that is, they are "procedurally defaulted." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim has been waived by virtue of the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, the federal court must determine whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the court has determined that the petitioner has not complied with a state procedural rule, and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for his failure to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir.1985).

In order to establish cause, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Constitutionally ineffective counsel may constitute cause to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). However, in

order to constitute cause, an ineffective assistance of counsel claim generally must "'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.'" *Id.* at 452 (quoting *Murray v. Carrier*, 477 U.S at 479). Before counsel's ineffectiveness can constitute cause sufficient to excuse a procedural default, "that ineffectiveness must itself amount to a violation of the Sixth Amendment, and therefore must be both exhausted and not procedurally defaulted." *Burroughs v. Makowski*, 411 F.3d 665, 668 (6th Cir. 2005). If the ineffective assistance of counsel claim is itself procedurally defaulted, a petitioner must be able to satisfy the "cause and prejudice" standard in connection with that claim in order to excuse the procedural default of the other claims. *Edwards v. Carpenter*, 529 U.S.at 450-51. The Supreme Court explained the importance of this requirement:

> We recognized the inseparability of the exhaustion rule and the procedural-default doctrine in *Coleman*: "In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." 501 U.S., at 732, 111 S.Ct. 2546, 115 L.Ed.2d 640. We again considered the interplay between exhaustion and procedural default last Term in *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999), concluding that the latter doctrine was necessary to "'protect the integrity' of the federal exhaustion rule." *Id.*, at 848, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (quoting *id.*, at 853, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting)). The purposes of the exhaustion requirement, we said, would be utterly defeated if the prisoner were able to obtain federal habeas review simply by "'letting the time run'" so that state remedies were no longer available. *Id.*, at 848, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1. Those purposes would be no less frustrated were we to allow federal review to a prisoner who had presented his claim to the state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it. In such circumstances, though the prisoner would have "concededly exhausted his state remedies," it could hardly be said that, as comity and federalism require, the State had been given a "fair

> 'opportunity to pass upon [his claims].'" *Id*., at 854, 526 U.S. 838,
> 119 S.Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting)
> (emphasis added) (quoting *Darr v. Burford*, 339 U.S. 200, 204, 70
> S.Ct. 587, 94 L.Ed. 761 (1950)).

*Edwards*, 529 U.S. at 452–53.

If, after considering all four factors of the *Maupin* test, a court concludes that a procedural default has occurred, that court may not consider the merits of the procedurally defaulted claim unless "review is needed to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent." *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Murray v. Carrier*, 477 U.S. at 495–96).

In claim one, Petitioner alleges, *inter alia*, that he was denied a fair trial because the prosecutor improperly implied, during closing argument, that Petitioner was a drug dealer and had a drug related motive to kill the victim and, during cross-examination, falsely accused Petitioner's mother of telling a third party that Petitioner had taken extraordinary measures immediately after the shooting to rid his body and clothes of any trace evidence. In claim five, Petitioner alleges that the substitution of an alternate juror for a deliberating juror violated Petitioner's right to have his trial completed by a particular tribunal. Respondent contends that Petitioner waived these claims by failing to object to these matters at trial, and because the state appellate courts reviewed these claims only for plain error.

The state appellate court denied Petitioner's claims of prosecutorial conduct in relevant part as follows:

> The test for prosecutorial misconduct is whether the remarks were
> improper and, if so, whether they prejudicially affected the
> accused's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14
> (1984); *State v. Howard*, 10th Dist. No. 08AP–177, 2009–Ohio–
> 2663, ¶ 31. The touchstone of the analysis "is the fairness of the

trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). The prosecutor's conduct cannot be grounds for a new trial unless the conduct deprives the defendant of a fair trial. *State v. Keenan*, 66 Ohio St.3d 402, 405 (1993). In considering prejudice, we must consider the following factors: (1) the nature of the conduct, (2) whether counsel objected, (3) whether the court gave corrective instructions, and (4) the strength of the evidence against the defendant. *State v. Tyler*, 10th Dist. No. 05AP–989, 2006–Ohio–6896, ¶ 20.

According to Lewis, McCreary was at Vida Place at the time of the shooting to smoke marijuana, but he was the only one in the house using drugs at that time. During her cross-examination, Lewis testified she was aware police believed Vida Place to be a "drug house," though she did not know if drugs were ever sold from the house, and, she stated, "[t]hey have no proof of that." (Tr. 125.) On further cross-examination, Lewis admitted people have told her Vida Place was known as a drug house. Lewis also testified that, though the police told her they thought the shooting had something to do with drugs, "[i]t had absolutely nothing to do with drugs." (Tr. 150.) According to Lewis, she did not know whether or not Canty was a drug dealer, but she knew Canty and appellant "did not do no type of business together" because "they weren't friends." (Tr. 151.) Evidence was also produced at trial that Canty had $4,331.49 in his pockets at the time of the shooting, and $9,000 in cash and multiple pieces of jewelry were recovered from appellant's residence. Additionally, drugs were found at Vida Place, and drugs were found at appellant's residence.

According to appellant, prosecutorial misconduct occurred during closing arguments, wherein the prosecutor made the following statements:

The judge told you I don't have to show why he did it. Just what he did, and what intention he had when he did it. I don't have to prove the why, just the what. And what he did was murder.

It is not an element of the offense. But I would suggest to you, I would argue to you, look at what is found in our victim's pockets, over $4,300 in cash.

What can you infer James Daniel Canty did for a living based upon that? All right.

And then looking at all of the facts and circumstances, look at what is found in his home, State's 12 and State's 13: $9,000 dollars; gold

diamond encrusted jewelry. His own mom admits it is his. She said the nine grand is her and her husband's. Never kept together.

What do you think he does for a living? Do you think he is a quiet, Columbus State student?

I don't have to prove motive, ladies and gentlemen. But I would argue to you the motive is pretty clear in this case.

(Tr. Vol. IV, 514.)

Because appellant did not object to any portion of the closing argument of plaintiff-appellee, State of Ohio, we review for plain error. A court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. *Id*. We may reverse only when the record is clear that a defendant would not have been convicted in the absence of the improper conduct. *State v. Williams*, 79 Ohio St.3d 1, 12 (1997). Moreover, because the trial court instructed the jury the closing arguments were not evidence, we presume the jury followed the instruction and did not consider the closing arguments as evidence. *State v. Trewartha,* 10th Dist. No. 05AP–513, 2006–Ohio–5040, ¶ 21, citing *State v. Raglin*, 83 Ohio St.3d 253, 264 (1998).

A prosecutor is afforded a certain degree of latitude in his concluding remarks and may draw reasonable inferences from evidence at trial and may comment on those inferences during closing argument. *State v. Hairston*, 10th Dist. No. 01AP252 (Sept. 28, 2001), appeal not allowed, 94 Ohio St.3d 1433 (2002); *State v. Thomas,* 10th Dist. No. 02AP–778, 2003–Ohio–2199. "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *Smith* at 14. A defendant is entitled to a new trial only when a prosecutor makes improper remarks and those remarks substantially prejudice the defendant. *Id*.

To determine if the alleged misconduct resulted in prejudice, we must consider "'(1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant.' " *Tyler* at ¶ 20, quoting *State v. Braxton*, 102 Ohio App.3d 28, 41 (8th Dist.1995), *discretionary appeal not allowed*, 73 Ohio St.3d 1425 (1995). In addition, the prosecutor's conduct must be considered in the context of the entire trial. *State v. Bryan*, 101 Ohio St.3d 272, 2004–Ohio–971, ¶ 151, citing

*Keenan* at 410. The touchstone of this analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, rather than the culpability of the prosecutor. *Phillips* at syllabus.

In appellant's view, the prosecutor's comments relied on facts not in evidence and required the jury to impermissibly stack inferences to reach the conclusion that drugs were the motive for the shooting. However, a review of the challenged statements reveals the prosecutor did not say the shooting was drug related. Rather, the prosecutor told the jury to infer what it wanted from the evidence presented. Though the passage quoted above focuses on the money, when placed in context with all of the evidence presented throughout the trial, including evidence that Vida Place had a reputation as a "drug house," and drugs were found at both Vida Place and appellant's residence, we do not conclude the prosecutor's comments were improper.

Because the prosecutor asked the jury to infer what it liked from the evidence presented, we reject appellant's argument that the prosecutor asked the jury to improperly stack inferences or that the prosecutor's comments were otherwise improper. Further, even if we were to determine the prosecutor's comments consisted of improper innuendo, when viewing the prosecutor's comments in the context of the entire trial and in light of the instruction given by the trial court, along with the presumption that juries obey instructions from the court, we cannot conclude appellant's substantial rights were prejudicially affected here.

Additionally, one of the factors to consider when assessing whether prejudice resulted from the alleged prosecutorial misconduct is the strength of the evidence against the defendant. Here, the state presented testimony of a witness claiming she saw appellant shoot Canty while Canty stood near the driver's side of appellant's Tahoe. The state also presented evidence that a blood spot on the driver's side door of the Tahoe contained a DNA profile matching that of Canty. Given the evidence presented, we cannot find prejudice even if the prosecutor's closing arguments are deemed to constitute misconduct.

*State v. Hunt*, 2013 WL 6406316, at *3-5.

Appellant also challenges the prosecutor's questions posed to appellant's mother, wherein the following exchange occurred:

Q. Have you talked to Tony Marcum since this happened?

A. Yes, I have.

Q. You told Tony Marcum that, in fact, when your son came home in the early morning hours of May 16th, he immediately took his clothing off and threw them in the washer.

A. Heavens, no, I never told Tony Marcum nothing like that.

Q. You told Tony Marcum that your son immediately took a shower.

A. I never told Tony Marcum that.

Q. And that he washed his hands with bleach.

A. I did not tell Tony Marcum nothing of the sort.

Q. Why would Tony Marcum say such things?

A. I have no idea.

* * *

Q. And can you give us why Tony Marcum would say such things about your conversation?

A. No.

(Tr. 492–93.)

Appellant did not object to this questioning during trial; therefore, we review this issue using a plain-error analysis pursuant to Crim.R. 52(B). *State v. Saleh*, 10th Dist. No. 07AP–431, 2009–Ohio–1542, ¶ 68 (no objection to alleged prosecutorial misconduct during cross-examination reviewed under plain-error standard).

Here, appellant's mother testified on direct examination that she had not seen appellant after he came home and delivered the box springs and mattress set at some point after 11:00 p.m. on May 15. While this attempt at impeachment may have involved inadmissible hearsay, such questioning does not rise to the level of prosecutorial misconduct. In *State v. Gillard*, 40 Ohio St.3d 226 (1988), *certiorari denied, Gillard v. Ohio*, 492 U.S. 925 (1989), the Supreme Court of Ohio found that a cross-examiner may ask a question if the examiner has a good-faith belief that a factual predicate for the question exists. Inasmuch as the prosecutor's

13

good-faith basis for asking the question was never challenged, the court must presume she had one. *Id*. at 231. *See also State v. Finkes*, 10th Dist. No. 01AP–310 (Mar. 28, 2002); *Columbus v. Marchand*, 10th Dist. No. 95APC04–430 (Oct. 12, 1995); *State v. Ferguson,* 10th Dist. No. 95APC03–347 (Sept. 19, 1995).

Consequently, we cannot conclude this line of questioning constituted prosecutorial misconduct or that appellant's substantial rights were prejudicially affected by the same.

*Id*. at *7.

The United States Court of Appeals for the Sixth Circuit has held that plain error review does not constitute a waiver of the state's procedural default rules.  *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).  "[A] state court's plain error analysis does not save a petitioner from procedural default[.]"  *Conley v. Warden, Chillicothe Correctional Inst*., 505 Fed.Appx. 501, 506, unpublished, 2012 WL 58617131 (6ᵗʰ Cir. Nov. 20, 2012)(quoting *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006)(citing *Scott v. Mitchell*, 209 F.3d 854, 866 (6th Cir. 2000)). *See also Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001).  Additionally, "the state procedural rule constituted an adequate and independent ground of decision. Ohio's contemporaneous objection rule has been deemed an adequate and independent state ground in numerous Sixth Circuit decisions."  *Conley*, 505 Fed.Appx. at 506 (citing *Wogenstahl v. Mitchell*, 668 F.3d 307, 335 (6th Cir. 2012); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011).

However, Petitioner argues that the state appellate court did not in fact enforce the procedural rule at issue but instead conducted a merits review of these claims, and that the procedural default analysis fails to satisfy the second part of the *Maupin* test.  *Reply* (ECF No. 12, PageID# 1531-32.)  This Court disagrees.  The record clearly establishes that the appellate court conducted only a plain error review because of Petitioner's failure to object to any portion of the prosecutor's closing argument and failure to object to the challenged line of questioning

14

during the cross-examination of Petitioner's mother.  Further, an appellate court's alternative ruling on the merits does not undermine a finding of procedural default because 'a state court need not fear reaching the merits of a federal claim in an alternative holding.'"  *Conley*, 505 Fed.Appx. at 506 (citing *Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989); *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998)).

The state appellate court rejected Petitioner's claim regarding the substitution of an alternate juror, as follows:

> [A]ppellant contends it was error for the trial court to replace Juror No. 7 with an alternate juror after the jury had begun its deliberations.
>
> R.C. 2945.29 permits a court to replace a juror with an alternate "[i]f, before the conclusion of the trial, [the original] juror becomes sick, or for other reason is unable to perform his duty." As of 2008, Crim.R. 24(G)(1) allows the court to replace a juror after deliberations have begun. However, "[i]f an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew." Crim.R. 24(G)(1). A trial court's decision to remove or retain a juror is reviewed under an abuse of discretion standard. *State v. Owens*, 112 Ohio App.3d 334, 336 (11th Dist. 1996).
>
> The jury began its deliberations at 1:45 p.m., and by 2:30 p.m., the trial judge received a note stating that Juror No. 7 "has expressed reluctance to continue as a juror due to the fact she does not feel comfortable being in close proximity to the evidence (particularly the pictures of the victim). She would like to be exchanged with one of the alternate jurors." (Tr. 567.) Based on this communication from the jury, the trial judge voir dired Juror No. 7 to determine the juror's concern. The juror indicated she was not "comfortable being so close to the evidence," and the exhibits depicting "the dead person." (Tr. 568.) The prosecutor asked the juror, "[a]re you saying you wouldn't be able to look at the evidence in this case?," and the juror responded in the affirmative. (Tr. 569.) Juror No. 7 stated, "I was shaking when it was so close to me." (Tr. 570.) After the juror was voir dired, the trial judge excused Juror No. 7 and impaneled alternate Juror No. 13, who had not yet been excused. Thereafter, all of the jurors were brought into the courtroom, and the trial judge instructed them to "start all

over again" with their deliberations. (Tr. 574.) Appellant's counsel took part in the voir dire of Juror No. 7 and did not object when the trial judge indicated "the appropriate solution" was to excuse Juror No. 7 and impanel Juror No. 13. (Tr. 572.)

Upon review of the record, we find no error, plain or otherwise, in the trial court's decision to replace Juror No. 7 with Juror No. 13. During the voir dire and in the presence of appellant, both counsel and the trial court asked questions of Juror No. 7 pertaining to her ability to remain as a juror. Juror No. 7 indicated she was physically affected by the evidence and would not be able to look at the evidence presented and, for these reasons, was asking that she be excused. Once Juror No. 13 replaced Juror No. 7, the trial court instructed the jury to begin its deliberations anew. Accordingly, we do not find the trial court abused its discretion in removing Juror No. 7 as being unable to perform her duty as a juror.

For all the foregoing reasons, appellant's third assignment of error is overruled.

*Id*. at *15-16.

Citing *Patterson v. Haskins*, 316 F.3d 596, 605 (6th Cir. 2003), Petitioner argues that his claim regarding the allegedly improper replacement of Juror Number 7 is not procedurally defaulted because the state appellate court failed to enforce the procedural default at issue, *i.e.*, his failure to object, and reviewed the merits of this claim. *Reply* (ECF No. 12, PageID# 1558.) In *Patterson,* the Sixth Circuit held that the state appellate court had conducted a merits review in Rule 26(B) proceedings, on a claim involving allegedly improper jury instructions that had not been objected to at trial, when it found that the jury instructions provided a "sufficiently detailed and a correct statement of Ohio law" and stated that the trial court committed no "error, plain or otherwise in giving of the jury instructions." *Patterson*, 316 F.3d at 605.

The Ohio Court of Appeals, in denying Patterson's application to reopen his appeal, did not "clearly and expressly state[ ] that its judgment rests on a state procedural bar." *Harris*, 489 U.S. at 263, 109 S.Ct. 1038 (citation and internal quotation marks omitted). Instead, when the Ohio Court of Appeals concluded that "the court

> did not commit error, plain or otherwise in giving of the jury instructions," it indicated that the decision rested on an evaluation of the merits of his claim. . . . Furthermore, the Ohio Court of Appeals made no mention of Patterson's failure to object to the jury instructions during trial. We therefore conclude that Patterson is not procedurally barred from pursuing this claim. *Id.*

*Id.*

This case may be distinguished from *Patterson*, however, because here, the state appellate court had already discussed its limited standard of review on the basis of plain error because of Petitioner's waiver of certain claims of prosecutorial misconduct due to his failure to object. The appellate court expressly referred to trial counsel's failure to object to the trial judge's determination that "'the appropriate solution' was to excuse Juror No. 7 and impanel Juror No. 13" prior to indicating that it found "no error plain or otherwise" in its discussion of the claim. *State v. Hunt*, 2013 WL 6406316, at *15-16. This Court therefore concludes that the state appellate court in fact enforced Ohio's contemporaneous objection rule. That said, and in perhaps an excess of caution, however, the Court will address *infra* the merits of Petitioner's claim regarding the trial court's replacement of Juror Number 7.

The Court concludes that Petitioner has procedurally defaulted his claims of prosecutorial misconduct during closing argument and cross-examination of Petitioner's mother. However, Petitioner may still secure review of these claims on the merits if he demonstrates cause for his failure to observe Ohio's contemporaneous objection rule, as well as actual prejudice from the constitutional violations that he alleges. *See Coleman*, 501 U.S. at 753; *Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003).

As cause for these procedural defaults, Petitioner asserts the denial of constitutionally effective assistance of counsel. *Reply* (ECF No. 12, PageID# 1532 n.1.) In order to determine whether Petitioner has established cause and prejudice sufficient to excuse his procedural

defaults, the Court will address the merits of Petitioner's claim of ineffective assistance of counsel.

## Standard of Review

Petitioner seeks habeas relief under 28 U.S.C. § 2254. The Antiterrorism and Effective Death Penalty Act ("AEDPA") sets forth standards governing this Court's review of state-court determinations. The United State Supreme Court describes AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, — U.S. —, —, 134 S.Ct. 10, 16 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt." (internal quotation marks, citations, and footnote omitted)).

The factual findings of the state appellate court are presumed to be correct.

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).  Moreover, "a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)); 28 U.S.C. § 2254(d)(1) (a petitioner must show that the state court's decision was "contrary to, or involved an

unreasonable application of, clearly established federal law"); 28 U.S.C. § 2254(d)(2) (a petitioner must show that the state court relied on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding"). The United States Court of Appeals for the Sixth Circuit has explained these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular...case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id*. at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Coley*, 706 F.3d at 748–49. The burden of satisfying the standards set forth in § 2254 rests with the petitioner. *Cullen v. Pinholster*, 563 U.S.170, 181 (2011).

"In order for a federal court to find a state court's application of [Supreme Court precedent] unreasonable, . . . [t]he state court's application must have been objectively unreasonable," not merely "incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520–21, (2003) (internal quotation marks omitted) (citing *Williams v. Taylor*, 529. U.S. at 409, and *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)); *see also Harrington v. Richter*, 131 S.Ct. at 786 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as "'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In considering a claim of "unreasonable application" under § 2254(d)(1), courts must focus on the reasonableness of the result, not on the reasonableness of the state court's analysis. *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009)

("'[O]ur focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not whether the state court considered and discussed every angle of the evidence.'" (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*))); *see also Nicely v. Mills*, 521 Fed.Appx. 398, 403 (6th Cir. 2013) (considering evidence in the state court record that was "not expressly considered by the state court in its opinion" to evaluate the reasonableness of state court's decision). Relatedly, in evaluating the reasonableness of a state court's ultimate legal conclusion under § 2254(d)(1), a court must review the state court's decision based solely on the record that was before it at the time it rendered its decision. *Pinholster*, 563 U.S. at 181. Put simply, "review under § 2254(d)(1) focuses on what a state court knew and did." *Id*. at 182.

### Ineffective Assistance of Counsel

The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). The standard for demonstrating a claim of ineffective assistance of counsel is composed of two parts:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). Scrutiny of defense counsel's performance must be "highly deferential." *Id*. at 689.

With respect to the first prong of the *Strickland* test, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* To establish the

second prong of the *Strickland* test, *i.e.*, prejudice, a petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different.  *Id*. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*.  Because a petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, should the court determine that the petitioner has failed to satisfy one prong, it need not consider the other.  *Id*. at 697.

The state appellate court rejected Petitioner's claim of ineffective assistance of counsel based on his attorney's failure to object to the prosecutor's statements referred to during closing argument, noting that counsel may have made a tactical decision, and concluding that the prosecutor had not acted improperly in referring to evidence of money, jewelry, and drugs in arguing that the evidence established a motive for the offenses charged:

> Appellant first asserts his trial counsel was ineffective for failing to object to prosecutorial misconduct as outlined in his first assignment of error.
>
> Failure to object to prosecutorial misconduct "does not constitute ineffective assistance of counsel *per se*, as that failure may be justified as a tactical decision." (Emphasis sic.) *State v. Gumm*, 73 Ohio St.3d 413, 428 (1995). Furthermore, we have already overruled appellant's first assignment of error and concluded appellant has not established prosecutorial misconduct in this case. "'[C]ounsel will not be deemed ineffective for failing to make a meritless objection.'" *State v. Pariscoff*, 10th Dist. No. 09AP–848, 2010–Ohio–2070, ¶ 37, quoting *State v. Copley*, 10th Dist. No. 04AP–1128, 2006–Ohio–2737, ¶ 48, citing *State v. Shahan*, 4th Dist. No. 02CA63, 2003–Ohio–6945, ¶ 38. As such, because it appears that any objections on the grounds of prosecutorial misconduct based on the allegations contained in appellant's first assignment of error would not have been successful, trial counsel was not ineffective for failing to raise those objections.

*State v. Hunt*, 2013 WL 6406316, at *23.

This Court is not persuaded that Petitioner has established that the state appellate court's decision violates 28 U.S.C. § 2254(d).  Petitioner elicited testimony on cross-examination of Detective Siniff that police had received information that heroin and pills were being sold out of the house on Vida Place, and Siniff had confronted all of the potential witnesses to the shooting regarding alleged drug activity at Vida Place.  *Transcript* (ECF No. 6-3, PageID# 829.)  During the cross-examination of the prosecution's key witness, Alexis Lewis, defense counsel repeatedly asked her about her involvement in drugs and about drug activity at the house by her or by others.  Defense counsel asked Lewis whether police had characterized Vida Place as a "drug house," whether drugs were being sold out of the house, and whether Petitioner and the victim had been involved in drug dealing.  *See, e.g*., *id*. (PageID# 647-48, 657. 669, 673-75.) Therefore, Petitioner raised the issue of a connection between drug activity and the murder. Lewis testified that she had been addicted to Percocet but had gone through drug rehabilitation and she denied using drugs since her release from prison.  *Id.* (PageID# 636.)  She acknowledged, however, that other people smoked marijuana in the house.  *Id.* (PageID# 591.) Although police believed that the shooting was drug related, she disagreed.  She denied that Petitioner and the victim were involved in the drug business.  *See id*.  Police found drugs in the house, but  Lewis testified that she did not know whose they were.  *Id.* (PageID# 641-42.)  Police also found drugs in Petitioner's home as well as large sums of money in the victim's pockets and at Petitioner's house.

Therefore, evidence regarding possible drug related activity and its potential connection to the murder was presented to the jury, and much of that evidence was elicited by defense counsel during the cross-examination of prosecution witnesses.  It appears to have been a theory

of the defense that Canty's death may have been drug related; defense counsel also raised the issue in closing argument.[1]

Contrary to Petitioner's argument here, the prosecutor did not improperly raise argument or insinuation based on evidence that had not been presented to the jury. "[A] prosecutor is allowed 'to argue reasonable inferences from the evidence[.]'" *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002)(quoting *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000)). Moreover, although Petitioner argues that the prosecutor improperly fabricated a drug-related motive for the killing, Petitioner himself raised the same suggestion in what would not have been an unreasonable strategic decision in view of the evidence presented. *See, e.g., Combs v. Coyle,* 205 F.3d 269, 278 (6th Cir. 2000)("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]")(citing *Strickland*, at 690-91). *See also Abernathy v. Hobbs*, 748 F.3d 813, 816 (8th Cir. 2014) ("recognizing a court's obligation under *Strickland* to refrain from second-guessing trial counsel's strategic decisions."). In short, Petitioner has failed to establish that his attorney performed in a constitutionally ineffective manner by failing to object to the prosecutor's comments during closing argument.

Further, like the state appellate court, this Court is not persuaded that Petitioner can establish prejudice, as that term is defined in *Strickland*, in view of the substantial evidence of Petitioner's guilt. Petitioner characterizes the evidence against him as "extremely weak," in view of Nathaniel Sims' identification or description of the car he saw leaving the murder scene and because police were aware of, but did not interview, other suspects who owned a vehicle that

---

[1] Defense counsel stated:

> [Police] knew the house, Vida Place, was a drug house. In fact, he confronted Lexi Lewis about that. Remember that. There was already heroin and pills being sold out of that house. It was common knowledge, he said, and started investigating the crime.

*Transcript* (ECF No. 6-4, PageID# 1066.)

may have fit the description of the vehicle involved in the murder.  *Reply* (ECF No. 12, PageID# 1533.)  Petitioner also asserts that there was no evidence to indicate the time frame during which the blood containing the victim's DNA may have been placed on his car.  *Id*.  He argues that Lewis' testimony was inconsistent and unreliable, and that her account of the events at issue was implausible.  *Id.* (PageID# 1534-38.)  He refers to the "unexplained presence of Marcum's latent fingerprints" on his car as "a major hole in the State's case." *Id.* (PageID# 1538.)

Upon review of the record, this Court is not persuaded by Petitioner's arguments or by his characterization of the evidence against him as weak or of Lewis' account of the events as unworthy of credit.  Lewis met Petitioner through her boyfriend prior to the date of the shooting. *Transcript* (ECF No. 6-2, PageID# 593.)  She had known him for approximately five to six months.  *Id.* (PageID# 595.)  She "estimated" that he showed up at the house at between 2:00 and 2:30 a.m. *Id.* (PageID# 593.)  The homicide occurred at 3:45 a.m.  *Id.* (PageID# 595.)  According to Lewis, Petitioner stayed at the house 20-30 minutes before he was asked to leave. She was not certain of the time frame:  "I don't know.  I don't remember a specific time frame."  *Id*.  She guessed that he had probably stayed until about 3:00 a.m. *Id*.  She admitted, repeatedly, that she had lied to police and had changed her story because she did not want to get involved, and she was scared for her life and for that of her two-year old child and family.  *Id.* (PageID# 609, 611, 617-18, 643, 661-62, 683-84.)

> I didn't want to be involved in anything.  This man wasn't even in custody yet.
>
> Q.  So you were just lying?
>
> A.  Yes.
>
> Q.  Lying about what you saw?
>
> A.  Of course.

Q.  And who was there?

A.  Of course.

***

I was scared for my life.  I have a family and a little boy.

*Id.* (PageID# 661-62.)

Lewis did not, for example, initially tell police that Ashley had been home on the night of the murder because she did not want to put Ashley's life in jeopardy.  She was sober.  *Id.* (PageID# 650.)  She had been to rehab and had not used drugs since she had been released from jail, four and one half months earlier.  *Id.* (PageID# 636-37; 642.)  She did not waiver, at trial, in her account of the events or in her testimony that she had watched Petitioner shoot and kill Canty from his car on the night in question.  She had a clear view and street lights had illuminated the road.  *Id.* (PageID# 650-51.)  She heard talking:  "Bro Bro Bro Bro Bro."  *Id.* (PageID# 653.)  She heard the noise, so she walked to the front door.  *Id.* (PageID# 654.)  She saw Andrew Hunt and James Canty in the middle of the street.  *Id.*  She stood at the glass door.  After Petitioner had shot Canty five or six times, she ran outside.  *Id.* (PageID# 657.)

> They were very calmly talking to each other when I was at the screen door.  And after that, Andrew walked to his truck and James followed.  Andrew got in his truck, put the window down, and "Dan Dan" was talking through his truck window.  And "Dan Dan" went to walk away.  Then Andrew said, "Dan."  He turned around and that's when he shot him.

*Id.* (PageID# 662.)

Q.  You could hear Andrew, or whoever was in the truck, say "Dan"?

A.  Yes.  His back was turned towards Andrew.

Q.  How far did he walk away from the truck?

25

>    A.  Probably a foot.  He called him back to turn him back around
>    and kill him.  He looked straight at him.  He could have shot him
>    from behind.  But he had to turn him around, call his name, and
>    turned him around just to shoot him looking at him and his face.

*Id.* (PageID# 663.)

>    Q.  How many shots?
>
>    A.  Five or six times.
>
>    Q.  And after five or six times. . . was "Dan Dan" still on his feet?
>
>    A.  No, he was laying flat on his face on the ground.
>
>    Q.  After the first, second, or third shot?
>
>    A.  I don't know.  However many times it took to kill him.

*Id.* (PageID# 663-64.)

Lewis knew both the Petitioner and the victim and saw Petitioner sitting in the same vehicle, a Chevy Tahoe with tinted windows and rims, that he always drove.  She had not seen him permit anyone else drive it; he was very protective of the car.  It was a "gold silver" metallic flashy vehicle.  *Id.* (PageID# 603.)

Nathanial Sims told police that he had seen a 2003 gray Chevy Tahoe leaving the scene immediately after the shooting.  *Transcript* (ECF No. 6-4, PageID# 975.)  He identified Petitioner's truck as that vehicle.  *Id.* (PageID# 979.)  It had tinted windows.  *Id.* (PageID# 990.)  He did not see any rims on the car. *Id.* (PageID# 984.)  At trial, Sims testified that the car he saw on the night of Canty's murder did not have the same rims or wheels on it as the photograph of Petitioner's vehicle that was shown to him by the prosecutor.  *Id.* (PageID# 987-88.)[2]  However,

---

[2] Q.  If this was the Tahoe (used in the murder), someone had to change the wheels and the rims before police seized it is what you are saying, is that correct?

A.  Yes.

he also testified, "That is the truck I saw.  It has got to be.  It has got different rims on it."  *Id.*
(PageID# 990.)

Lewis was worried about getting into trouble with the police because, at the time of the
murder, she was on probation in connection with a domestic violence charge.  However, within
minutes of being taken to the police station, she identified Petitioner as the shooter and provided
his description to police.  *Transcript* (ECF No. 6-2, PageID# 614-15.)  Detective Landis told her
that she could go home and permitted her to use his cell phone to call for a ride. *Id.* (PageID#
620-21.)  She had refused to speak to the defense investigator regarding the case, because she did
not want to help Petitioner win the case.  *Id.* (PageID# 633-34.)  She recalled that the victim
wore shorts and flip flops. *Id.* (PageID# 655.)  Although she did not initially recall what
Petitioner had been wearing, when she was pressed on the issue on cross-examination, she
"guessed" that had been wearing a white T-shirt, light colored jeans, black gloves, and green-
gray Nike Griffeys. *Id.* (PageID# 658-59.)

This Court is not persuaded that the transcript supports Petitioner's contention that drug
use had so adversely affected Lewis' thought processes that she could not distinguish truth from
lie, or that police coerced her into identifying Petitioner as Canty's killer.  Similarly, Lewis'
statements, made during her 911 call to police, do not indicate that she had no knowledge about
what had happened:

> I have never been in this situation before.  I am 21 years old.  I
> grew up in the suburbs.  I have never had to see somebody I love
> get shot and killed.  I don't know what I am supposed to say.
>
> ***
>
> I am scared for my life.

*Transcript* (ECF No. 6-4, PageID# 988.)

*Id.* (PageID# 664.)  Lewis' testimony is not, under the circumstances reflected in the record, unworthy of credit. Rather, it is consistent with some of her prior statements.  Moreover, Sims corroborated her description of Petitioner's vehicle as the Tahoe with tinted windows leaving the scene of the murder.  Although he testified at trial that new rims must have been placed on the vehicle, that testimony is not inconsistent with his prior statement to the police that he had not seen the rims on the vehicle.  *Transcript* (ECF No. 6-4, PageID# 991.)  Thus, Sims' testimony does not necessarily cast doubt on other substantial evidence of guilt.  Moreover, nothing in the record supports Petitioner's argument that police had reason to believe that Marcum, or some other individual, was a suspect in the crime.  It was uncontroverted that blood containing a DNA profile consistent with that of the victim was found on Petitioner's vehicle.  *Id.* (PageID# 904-05.)  The unexplained presence of the victim's blood on Petitioner's car on the morning after the shooting, combined with Lewis' eyewitness testimony and her identification of Petitioner, a person she had known previously and who was driving the car she knew to be his, as the shooter, constitutes strong evidence of guilt.  Further, testimony by Detective Siniff that Petitioner's car looked as if it had just been cleaned on the morning after Canty was killed, and evidence of cleaning supplies and dirty rags inside the car, could be viewed by the jury as an attempt to eliminate incriminating evidence and, thus, additional circumstantial evidence of guilt.   In short, this Court concludes that the record contains strong evidence of Petitioner's guilt.

Petitioner also claims that he was denied the effective assistance of counsel because his attorney failed to object to the prosecutor's questions during cross-examination of Petitioner's mother on whether she had told Tony Marcum that Petitioner took a shower, washed his clothes, and washed his hands with bleach when he returned home in the early morning hours on May 16, after Canty had been killed.  According to Petitioner, the prosecutor thereby violated *Berger v.*

*United States*, 295 U.S. 78 (1935).  In *Berger*, the United States Supreme Court reversed the conviction of a defendant after concluding that the prosecution had misstated

> the facts in his cross examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof is offered; of pretending to understand that a witness had said something which he had not said, and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and in general of conducting himself in a thoroughly indecorous and improper manner.

Id. at 84. *Berger* stands for the proposition that "courts should be alert to prevent abuse of the prior inconsistent statement rule by the prosecution's use of extra-judicial statements in the guise of impeaching witnesses, when the true purpose is to get before the jury substantive evidence which is not otherwise available."  *United States v. Brown*, 519 F.2d 1368, 1370 (6th Cir. 1975). "Laying such prejudicial allegations before a jury by dint of cross-examination without being prepared to prove them is generally regarded as reversible error."  *Id*. (citations omitted).   "Thus, a prosecutor who asks the accused a question that implies the existence of a prejudicial fact must be prepared to prove that fact."  *United States v. Silverstein*, 737 F.2d 864, 867-68 (10th Cir. 1984)(citations omitted).

At Petitioner's trial, by contrast, and as noted by the state appellate court, Petitioner failed to object to the prosecution's questioning in this regard; there is therefore nothing in the record to suggest that the prosecutor lacked a good faith basis for questioning Petitioner's mother regarding her alleged statements to Marcum, nor is there any reason to believe that she had never made such statements, or that the prosecution could not have established such statements by presenting Marcum as a prosecution witness.  *See United States v. Jungles*, 903 F.2d 468, 478-79 (7th Cir. 1990)("the government does not have a duty in every case to introduce the factual

predicate for a potentially prejudicial question posed on cross-examination, particularly [ ] where there is a reasonable suspicion that the circumstances underlying the question might be true.")(citing *United States v. Harris*, 542 F.2d 1283, 1307-08 (7th Cir. 1976)). In *United States v. Brown*, 519 F.2d at 1370, also referred to by Petitioner, the government conceded that the prosecution had no basis for his questions. *Id.* Similarly, in *United States v. Silverstein*, 737 F.2d at 867-68, the Court of Appeals for the Tenth Circuit held that it was error to permit the prosecutor to ask questions, over counsel's objection, that implied the existence of a fact that the prosecutor knew could not be supported by evidence. Such are not the circumstances here. Further, although Petitioner's mother flatly denied making such statements to Marcum, the record reflects strong evidence of Petitioner's guilt. Under all these circumstances, the Court is not persuaded that Petitioner has established that the state appellate court unreasonably applied *Strickland* when it rejected Petitioner's claim that he had been denied the effective assistance of counsel at trial.

It follows, then, that Petitioner has failed to establish cause and prejudice for his procedural defaults.

Additionally, the record fails to reflect that Petitioner can establish his "actual innocence" so as to justify a merits review of his procedurally defaulted claims. *See Souter v. Jones*, 395 F.3d 577, 589-90 (6th Cir. 2005).

## Claim One

In claim one, Petitioner raises additional claims of prosecutorial misconduct. He alleges that the prosecutor improperly elicited testimony from Detective Siniff that Marcum had provided cleaning services for Petitioner in order to attempt to eliminate any evidence of the

crime(s) charged, and misrepresented testimony of the State's trace evidence analyst during

closing argument.  The state appellate court rejected these claims as follows:

> Appellant next contends the prosecutor improperly placed Marcum's statements before the jury.
>
> [T]hree latent fingerprints taken from the Tahoe matched Marcum. According to Detective Siniff, prior to the fingerprints coming back as a match, Marcum's name had not been mentioned in the investigation. Based on the fingerprint testing, Detective Siniff testified he looked into Marcum's background, and the following exchange took place:
>
> Q. Did you find out things about Tony Marcum?
>
> A. Yes, sir.
>
> Q. Sir, do you know what a cleaner is?
>
> A. If you are talking about criminal activity, yes.
>
> Q. Tell the ladies and gentlemen of the jury what a cleaner is.
>
> A. A cleaner is somebody who goes to crime scenes and takes care of eliminating any possible evidence.
>
> Q. For who?
>
> A. For whoever hires him. Usually the person who committed the criminal act.
>
> * * *
>
> Q. Did you find out any information, through your background check or investigation of Mr. Marcum, whether Mr. Marcum has ever admitted to anyone to being a cleaner?
>
> A. Yes, sir.
>
> Q. What was that information?
>
> [Appellant's Counsel]: Objection, Your Honor. No foundation. We need a foundation before we get into speculation like this. I don't know who he has talked with.

THE COURT: Sustained.

[Appellant's Counsel]: Hearsay on top of hearsay.

THE COURT: Sustained.

Q. Did you talk to Dave DeVillers of the U.S. Attorney's Office?

A. No, sir.

Q. Did you find out that this person had talked to Dave DeVillers of the U.S. Attorney's Office?

A. Yes, sir.

Q. Did you talk to the detective that has had contact with Tony Marcum before?

A. Yes, sir.

[Appellant's Counsel]: Your Honor, once again, if they are going to try to bring someone else in, they ought to bring the people in and not talk to another person. I have no objection if he wants or bring in these people that say Tony Marcum done these things if he can tie it into this scene. We are talking speculation and hearsay on top of hearsay.

(Tr. 301–02.)

Thereupon, a side bar was held and testimony resumed.

On appeal, appellant states, "the prosecutor elicited testimony that Marcum had spoken with an Assistant United States Attorney and admitted being a 'cleaner.' " (Appellant's brief, 15–16.) Contrary to appellant's assertion, as the record demonstrates, Detective Siniff was asked if he was aware of whether Marcum admitted to anyone to being a cleaner, but Detective Siniff did not testify Marcum made this admission and/or to whom it was made. Moreover, the trial court sustained the objections of appellant's counsel, and the trial court later instructed the jury "not [to] speculate as to why the court sustained an objection to any question or what the answer to that question might have been." (Tr. 504.) The trial court reinforced the instruction by advising the jury not to "draw any inference or speculate on the truth of any suggestion included in a question that was not answered." (Tr. 504.) The jury is presumed to follow the court's instruction. *Raglin*

at 264, citing *State v. Goff*, 82 Ohio St.3d 123, 135 (1998). Because the court sustained appellant's objections to the questions and instructed the jury concerning the effect of the sustained objections, appellant fails to demonstrate the necessary prejudice. *See State v. Noling*, 98 Ohio St.3d 44, 2002–Ohio–7044, ¶ 94 (concluding prosecution's reference to the subject matter of a suppression hearing lacked prejudicial effect because the court sustained defendant's objection to the reference).

\*\*\*

Appellant also contends the prosecutor misrepresented the testimony of the state's trace evidence expert. It is not disputed that the only item of appellant's to undergo gunshot residue ("GSR") testing was a pair of batting gloves recovered from appellant's home. Test results indicated particles highly indicative of GSR were not present on the gloves. In his opening and closing statements, appellant's counsel referred to the police investigators' failure to test for GSR on appellant's person, clothing or Tahoe. During the rebuttal argument, the prosecutor stated:

> That is why we brought a GSR expert in to explain to you how fragile that evidence is. It's microscopic. You can get rid of it like by rubbing your hands. That is why they say the sooner the better. *That is why they say if it is outside two to four hours, don't bother looking for it because you are not going to find it. That is why they didn't test him.* That is why they didn't test the car. It is well past that time frame of when you would expect to find anything.

(Emphasis added.) (Tr. 550.)

From this quoted passage, appellant challenges the emphasized statements. It is appellant's position that the GSR expert did not provide such testimony.

As part of its case-in-chief, the state presented the testimony of Matthew Congleton, a trace evidence analyst in the laboratory section of the Ohio Bureau of Criminal Investigation ("BCI"). While we agree Congleton did not testify to any specific time frame regarding the collection of GSR samples, Congleton did testify that for testing the presence of GSR, he instructs police officers that he prefers "to see them collect their samples as soon as is reasonably possible." (Tr. 430.) Congleton also testified that GSR is lost "when someone is driving. They are rubbing the steering wheel or moving around in the vehicle." (Tr. 434.)

> Further, Congleton stated, "[t]he more movement, the more rubbing, the more interaction, the less likely that that gunshot residue is going to still be there to be found." (Tr. 438.)
>
> Additionally, Detective Siniff was asked, "[a]re you aware, based on your training and experience, whether there is a time frame in which this should be collected?" (Tr. 306.) To which Detective Siniff responded, "I know it has to be collected within two, maybe four hours at the tops." (Tr. 306.)
>
> In the prosecutor's rebuttal closing, he references why "they" did not perform a GSR test on appellant or the Tahoe, and, as the evidence established, it is the investigators that determine what evidence to submit for testing. Thus, the statement regarding the two-to-four hour window appears to be based on the testimony of Detective Siniff, not Congleton. Therefore, we do not find the prosecutor misrepresented Congleton's testimony.

*State v. Hunt*, 2013 WL 6406316, at *6-8.

The scope of federal habeas corpus review of a claim of prosecutorial misconduct is narrow. A federal court does not sit as an appellate court employing supervisory powers to rectify ordinary trial error in cases before it for habeas review. *Donnell v. DeChristoforo*, 416 U.S. 637 (1974). Rather, the Court must consider only whether the prosecutor's conduct was so egregious as to deny the petitioner fundamental fairness. *Id.* at 642–43; *Martin v. Foltz*, 773 F.2d 711, 716–17 (6th Cir. 1985); *Angel v. Overberg*, 682 F.2d 605, 607 (6th Cir. 1982)(*en banc*). This determination is made by evaluating the totality of the circumstances surrounding the case. *Angel v. Overberg*, 682 F.2d at 607.

> Factors relevant in making this inquiry are: the degree to which the remarks may tend to mislead the jury and to prejudice the accused; whether the remarks were isolated or extensive; whether they were deliberately placed before the jury; and the strength of the case against the accused. Finally, this Court notes the "extreme nature of the prosecutorial misconduct required for a federal court to issue the writ."

*Martin v. Foltz*, 773 F.2d at 716(citations omitted) (quoting *Cook v. Bordenkircher*, 602 F.2d 117, 120 (6th Cir. 1979)).

Upon consideration of the foregoing factors, the Court is not persuaded that Petitioner has established that he is entitled to relief on this basis.  As discussed by the state appellate court, the prosecutor did not actually elicit testimony from Detective Siniff indicating that Marcum had operated as a "cleaner" or that Marcum had done so in this case.  Further, the remarks were rather isolated, and the trial court properly instructed the jury prior to beginning its deliberations, as noted by the state appellate court.  *Transcript* (ECF No. 6-4, PageID# 1029.)  Also, again, the record reflects substantial evidence of Petitioner's guilt.

As to Petitioner's remaining claim of prosecutorial misconduct, upon review of the record, and for the reasons discussed by the state appellate court, Petitioner has failed to rebut the presumption of correctness afforded the state appellate court's factual finding that the prosecutor did not misrepresent the testimony of the prosecution witnesses.

Claim one is without merit.

### Claim Two

In claim two, Petitioner alleges that the evidence was constitutionally insufficient to sustain his conviction on the drive-by shooting specification.

Before a criminal defendant can be convicted consistent with the United States Constitution, there must be evidence sufficient to justify a reasonable trier of fact to find guilt beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In determining whether the evidence was sufficient to support a petitioner's conviction, a federal habeas court must view the evidence in the light most favorable to the prosecution.  *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson,* at 319).  The prosecution is not affirmatively required to "rule

out every hypothesis except that of guilt." *Id*. (quoting *Jackson,* at 326).  "[A] reviewing court 'faced with a record that supports conflicting inferences must presume – even if it does not appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id*. (quoting *Jackson*, at 326).

Moreover, federal habeas courts must afford a "double layer" of deference to state court determinations of the sufficiency of the evidence.  As explained in *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), deference must be given, first, to the jury's finding of guilt because the standard, announced in *Jackson v. Virginia*, is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Second, and even if a *de novo* review of the evidence leads to the conclusion that no rational trier of fact could have so found, a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *See also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009).  This is a substantial hurdle for a habeas petitioner to overcome, and Petitioner has not done so.

The state appellate court rejected Petitioner's claim of insufficiency of the evidence on the drive-by shooting specification as follows:

> [A]ppellant contends the record contains insufficient evidence to support the conviction for the specification of discharging a weapon from a motor vehicle.
>
> In contrast to assessing the weight of the evidence, an appellate court does not act as a "thirteenth juror" in determining the sufficiency of the evidence. *State v. New*, 197 Ohio App.3d 718, 2012–Ohio–468, ¶ 8 (10th Dist.). Rather, "[t]he issue of sufficiency presents a purely legal question for the court regarding the adequacy of the evidence." *Id*., citing *Thompkins* at 386. The relevant inquiry is whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a

reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

R.C. 2941.146(A) contains a firearm specification that adds a five-year prison term when a defendant commits a felony that includes the element of purposely or knowingly causing or attempting to cause the death of or physical harm to another, if the crime "'was committed by discharging a firearm from a motor vehicle other than a manufactured home.' " *State v. Swidas*, 133 Ohio St.3d 460, 2012–Ohio–4638, ¶ 1, quoting R.C. 2941.146(A).

According to appellant, Lewis's testimony established that appellant shot Canty from inside the Tahoe while the vehicle was still stationary and that appellant drove away from the scene after he discharged the firearm. Because no evidence was presented that the vehicle was moving at the time appellant discharged the firearm, appellant argues there is insufficient evidence to support his conviction under R.C. 2941.146(A).

Initially, we note that, contrary to appellant's position, R.C. 2941.146(A) concerns discharging a firearm from a motor vehicle, not only discharging a firearm from a moving motor vehicle. Hence, from the face of the statute, appellant's argument fails.

Moreover, in *Swidas*, the Supreme Court of Ohio had occasion to address R.C. 2941.146 and "what the word 'from' means in the phrase 'from a motor vehicle.' " *Id.* at ¶ 16. Using the usual, normal or customary meaning of the word "from," the *Swidas* court stated the following:

Webster's Third New International Dictionary 913 (3d Ed.1986) defines "from":

[U]sed as a function word to indicate a starting point: as (1) a point or place where an actual physical movement (as of departure, withdrawal, or dropping) has its beginning * * *.

The Oxford English Dictionary 210–211 (2d Ed.1989) also defines "from": "Denoting departure or moving away: governing a [substantive] which indicates a point of departure or place whence motion takes place."

Both definitions refer to a "point" or "place" whence something departs. In the statute, that point or place is "a motor vehicle." That place is not "the vicinity of a motor vehicle" or "near a motor

vehicle." The statute requires that the starting point of the activity is the motor vehicle itself.

But a motor vehicle cannot fire a weapon; the statute applies to people. That does not obviate the statutory requirement that the locus of the discharge of the weapon is the motor vehicle itself. For the locus of the discharge to be the motor vehicle, then, the person discharging the weapon must have a substantial physical connection to the vehicle. If a person were in or on a vehicle to the extent that the vehicle was providing substantial support to the person, the locus of that person's firing of the weapon would be the motor vehicle. Without a substantial physical connection to the vehicle, a shooter cannot be said to have fired a shot that commenced from the motor vehicle.

*Id.* at ¶ 18–21.

Because the evidence in *Swidas* established that the defendant was standing outside of the vehicle and no part of the defendant was on the vehicle at the time he discharged the firearm, the court held R.C. 2941.146 is not applicable when a person fires a weapon while standing completely outside a motor vehicle. *Id*. at ¶ 1. In so holding, the court reiterated that "[t]he key to a violation under R.C. 2941.146 is the location of the shooter at the time of the shooting." *Id*. at ¶ 23. "Strictly construing the statute in favor of the accused limits the reach of the statute to persons shooting a firearm from the vehicle itself, not from nearby. The only conduct that is clearly proscribed by the statute is discharging a firearm while the person firing the weapon is in or on a motor vehicle." *Id*. at ¶ 24.

The testimony provided from Lewis established that appellant and Canty were initially talking in the middle of the street. Thereafter, appellant began walking to his truck and Canty followed. Appellant got into the driver's side of the Tahoe and rolled down the window. Canty was standing "right up next to his truck" and the two men continued to talk. (Tr. 76.) According to Lewis, Canty turned around to walk away. Canty then turned to face the Tahoe and that is when appellant began shooting Canty from inside the driver's side of the Tahoe. Appellant then sped away from the scene. Additionally, Sims testified that after he heard several gunshots, he looked out the window and saw the driver of a truck roll up the window and "skirt[ ] out" of the area. (Tr. 450.)

When viewed in a light most favorable to the prosecution, as is required under our standard of review for reviewing the sufficiency

> of the evidence supporting a criminal conviction, the evidence presented at trial was sufficient to support appellant's conviction for the specification pertaining to discharging a firearm from a motor vehicle as proscribed in R.C. 2941.146. Consequently, we reject appellant's assertion that the record contains insufficient evidence to support the same and overrule his sixth assignment of error.

*State v. Hunt*, 2013 WL 6406316, at *20-22.

Petitioner argues that the state appellate court improperly interpreted or applied its own standards on the drive-by shooting specification contained in O.R.C. § 2941.146(A). He contends that the facts of this case do not implicate the heightened concerns raised by a "drive-by shooting," as that term is properly defined. He further maintains that, under Ohio law, the prosecutor must establish that he fired at Canty while his vehicle was moving. However, the state appellate court explicitly rejected this latter argument and this Court must defer to a state court's interpretation of its own state's laws. *See Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005) (this court must "defer to a state court's interpretation of its own rules of evidence and procedure") (citations omitted); *Bennett v. Warden, Lebanon Correctional Inst*., 782 F.Supp.2d 466, 478 (S.D.Ohio March 15, 2011) ("[T]he state courts are the final authority on state-law issues[;] the federal habeas court must defer to and is bound by the state court's rulings on such matters.") (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to re-examine state-court determinations on state law questions.")). Therefore, when viewing all the evidence in the light most favorable to the prosecution, Lewis' testimony alone provided constitutionally sufficient evidence to sustain Petitioner's conviction.

Claim two is without merit.

## Claim Three

In claim three, Petitioner alleges that he was denied the effective assistance of trial counsel because his attorney failed to object to the admission into evidence of cash and jewelry seized from the home of his mother, failed to object to hearsay statements of individuals at the crime scene who did not testify at trial, failed to request a limitation on the number of photographs of the homicide victim, and elicited damaging testimony during the cross-examination of Alexis Lewis.  Petitioner also asserts that the cumulative effect of these errors undermines the reliability of the guilty verdicts and gives rise to a reasonable probability that, but for counsel's errors, he would have been acquitted.[3]

The state appellate court denied this claim of ineffective assistance of trial counsel in relevant part as follows:

> [A]ppellant argues he received ineffective assistance of trial counsel. Under this assigned error, appellant contends his counsel was ineffective for failing to object to prosecutorial misconduct, failing to object to the introduction of evidence pertaining to cash and jewelry, failing to object to hearsay, failing to request a limitation of victim photographs, and eliciting damaging testimony on cross examination.
>
> To establish a claim of ineffective assistance of counsel, an appellant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced him. *State v. Jackson,* 107 Ohio St.3d 53, 2005–Ohio–5981, ¶ 133, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697 ("'[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.'").

---

[3] Petitioner also alleges that he was denied the effective assistance of trial counsel based upon his attorney's failure to object to certain instances of prosecutorial misconduct.  For the reasons already discussed, this Court is not persuaded that Petitioner has established that he is entitled to relief on this basis.

In order to show counsel's performance was deficient, an appellant must prove that counsel's performance fell below an objective standard of reasonable representation. *Jackson* at ¶ 133. The appellant must overcome the strong presumption that defense counsel's conduct falls within a wide range of reasonable professional assistance. *Strickland* at 689. To show prejudice, the appellant must establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. Hale,* 119 Ohio St.3d 118, 2008–Ohio–3426, ¶ 204.

\*\*\*

[A]ppellant contends his trial counsel was ineffective for failing to object to the admission of evidence pertaining to the jewelry and $9,000 in cash found at 483 South Ogden. According to appellant, this evidence allowed the prosecutor to argue appellant "was a drug dealer with a motive to kill" Canty. (Appellant's brief, 53–54.) This alone, however, is not sufficient to establish a basis for such evidence to be excluded from trial, and we reiterate that counsel will not be deemed ineffective for failing to make a meritless objection. *Pariscoff.* Moreover, appellant does not argue, much less establish, prejudice under *Strickland*. Given the evidence outlined previously throughout this decision, we conclude appellant has not demonstrated that, had his counsel objected to the admission of the money and jewelry and had such objection been sustained, there is a reasonable probability that the result of the proceeding would have been different.

Appellant also challenges his trial counsel's failure to object to hearsay. Here, appellant asserts that, though third-party statements offered to explain a police investigator's conduct are "not technically" hearsay, they should be excluded if the jury is likely to use them to connect the accused to the charged crime. (Appellant's brief, 54.) It appears appellant is challenging Officer Smith's testimony that a witness at the scene described a suspicious vehicle as an older model Tahoe that was silver in color and Detective Siniff's testimony that a witness at the scene picked two people out of a photo array as being the person involved. However, other than this blanket and conclusory assertion that such statements should have been excluded, appellant again fails to either argue or demonstrate prejudice.

Fourth, under this assigned error, appellant argues his trial counsel's failure to request a limitation of the admission of "gruesome photographs of the victim" constituted ineffective

assistance of counsel. (Appellant's brief, 55.) According to appellant, though the cause of death was undisputed, a total of 26 photographs including depictions of the crime scene as well as the autopsy were admitted into evidence.

Initially, we note that the admission of photographic evidence is left to the sound discretion of the trial court, and a trial court may indeed reject a photograph, otherwise admissible, due to its inflammatory nature if, on balance, the prejudice outweighs the relevant probative value. *State v. Maurer*, 15 Ohio St.3d 239, 264–65 (1984). However, "the mere fact that a photograph is gruesome or horrendous is not sufficient to render it *per se* inadmissible." (Emphasis sic.) *Id*. at 265, citing *State v. Woodards*, 6 Ohio St.2d 14, 25 (1966).

Further, as the Supreme Court of Ohio stated in *Maurer*, "[t]he fact that appellant stipulated the cause of death does not automatically render the photographs inadmissible." *Id*. at 265. Additionally, "relevant evidence, challenged as being outweighed by its prejudicial effects, should be viewed in a light most favorable to the proponent of the evidence, maximizing its probative value and minimizing any prejudicial effect to one opposing admission." *Id*., citing *United States v. Brady*, 595 F.2d 359 (6th Cir.1979).

Because we cannot say either that an objection to such evidence would have been successful or that there is a probability sufficient to undermine the confidence in the outcome of this case, we are unable to find ineffective assistance counsel.

Lastly, under this assigned error, appellant contends his trial counsel was ineffective for eliciting damaging testimony on cross-examination of Lewis, at which time Lewis was asked if Morrison told Lewis that Morrison did not want to have anything to do with the case and for Lewis to leave her out of it. Lewis responded, "She said: Please, don't. She has no protection, nobody to save her. She is at home with two little babies by herself. This man has got people out probably looking for me. And I have already got two major threats." (Tr. 144.) Appellant also challenges the line of questioning asking Lewis whether she had ever seen appellant with a gun and whether Lewis had told the police of the same.

Decisions regarding cross-examination are within the trial counsel's discretion and generally do not form the basis for a claim of ineffective assistance of counsel. *State v. Harris*, 10th Dist. No. 09AP–578, 2010–Ohio–1688, ¶ 28, citing *State v. Flors*, 38 Ohio App.3d 133, 139 (8th Dist.1987). The extent and scope of cross-

examination clearly falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel. *State v. Leonard*, 104 Ohio St.3d 54, 2004–Ohio–6235, ¶ 146. "'[A]n appellate court reviewing an ineffective assistance of counsel claim must not scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination.'" *State v. Dorsey*, 10th Dist. No. 04AP–737, 2005–Ohio–2334, ¶ 22, quoting *In re Brooks*, 10th Dist. No. 04AP164, 2004–Ohio–3887, ¶ 40.

After review, we have no cause to second-guess defense counsel's cross-examination strategy. The challenged cross-examination attempted to cast doubt upon the credibility of the witness. Though such strategy may have failed when unexpected damaging answers were given, an unsuccessful strategy does not render counsel's assistance constitutionally ineffective. *State v. Abdullah*, 10th Dist. No. 05AP–1316, 2006–Ohio–5412, ¶ 35 (although defense counsel's cross-examination strategy may have failed when he encountered unexpected damaging answers, such does not render counsel's assistance constitutionally ineffective).

For the foregoing reasons, appellant's seventh assignment of error is overruled.

*State v. Hunt*, 2013 WL 6406316, at *22-25.

"The Supreme Court has observed that the standards imposed by *Strickland* and § 2254(d) are both 'highly deferential,' so that in applying them together, 'review is "doubly" so.'" *Thompson v. Jenkins*, No. 1:15-cv-1460, 2016 WL 6892911, at *9 (N.D. Ohio Oct. 21, 2016)(citing *Harrington v. Richter*, 562 U.S. at 105 ).

Regarding trial counsel's obligation to object at trial, the Sixth Circuit has noted:

Because of the "numerous potentially objectionable events" that occur throughout trial, we have previously noted that "any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure

43

> cannot reasonably have been said to have been part
> of a trial strategy or tactical choice."
>
> *Hodge v. Haeberlin*, 579 F.3d 627, 648 (6th Cir. 2009) (quoting
> *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006)).

*Id.* at 9-10.

Although Petitioner argues otherwise, it is not apparent, particularly in view of the decision of the state appellate court, that an objection to the admission of photographs, or evidence regarding drugs, money, and jewelry, would necessarily have been sustained.

In any event, this Court agrees that Petitioner has failed to establish prejudice from any such failure to object , as that term is defined in *Strickland.* Petitioner complains that his attorney failed to object to the admission of testimony by Officer Smith that an eyewitness had advised that he saw a silver Chevy Tahoe with dark tinted windows. *Transcript* (ECF No. 6-2, PageID# 571-72.) Petitioner complains that his attorney should have objected to the admission of testimony of Detective Siniff that, when he arrived at the scene of the murder, he was provided with a description of a large SUV that was blue, silver, or gold, and that had custom rims and tinted windows. *Transcript* (ECF No. 6-3, PageID# 800-801.) Neil Spillman identified two individuals from a photo line-up, but he knew nothing about the homicide. *Id.* (PageID# 802-03.) Again, even assuming that an objection to this testimony would have been sustained, Petitioner has failed to establish prejudice, as that term is defined in *Strickland.*

The Court is likewise unpersuaded that Petitioner has established that he is entitled to relief based on his attorney's cross-examination of Alexis Lewis. Lewis acknowledged that she did not give "any honest answers" until her third statement to the police. Prior to the statement about which Petitioner complains, Lewis had already repeatedly indicated that she was frightened for her life and for that of her child, and for her family. She had also admitted lying to

police regarding whether Ashley was home at the time of the murder, because Ashley "did not want to be involved. She has two kids. She lives on her own. She has nobody there to protect her." *Transcript* (ECF No. 6-2, PageID# 665.) Lewis did not want to "put her life in jeopardy, as well." *Id.* (PageID# 666.) Thus, Lewis' statement, in response to counsel's question whether Ashley had told Lewis that she did not want to be involved (*i.e.,* "This man has got people out probably looking for me. And I have already got two major threats.") added little to the evidence that was not already before the jury. Moreover, Lewis admitted that she had never told the police that she had previously seen Petitioner with a gun. Upon review of the record, this Court agrees that Petitioner has failed to establish that his attorney performed in a constitutionally ineffective manner on his cross-examination of Lewis, or that Petitioner was prejudiced thereby under the *Strickland* test.

Claim three is without merit.

## Claim Four

In claim four, Petitioner alleges that his rights under the Double Jeopardy Clause were violated by the reception of new evidence on the repeated violent offender specification and on having a weapon while under disability charge after the State and Petitioner had rested their cases. The state appellate court rejected this claim as follows:

> [A]ppellant argues the state's submission of evidence supporting the WUD charge and the RVO specification after the parties had rested their respective cases violated his constitutional double jeopardy rights.
>
> Appellant waived his right to a jury on the WUD charge, and, by statute, the RVO specification is to be determined by the trial court rather than a jury. R.C. 2941.149(B). In this case, at the conclusion of the state's case-in-chief, appellant's counsel made a Crim.R. 29 motion, which the trial court denied. The state rested, and appellant presented two witnesses. Thereafter, the defendant rested. After the completion of jury instructions and closing arguments, the jury

commenced deliberations. After Juror No. 7 was replaced with Juror No. 13, deliberations resumed. Approximately two and one-half hours later, the jury indicated a verdict had been reached. Prior to bringing the jury into the courtroom, the following discussion occurred:

It is my intention to make my decision on [the WUD charge] on this coming Tuesday, the 13th. And in the event that the verdict by the jury is not guilty, that charge is pending. So, [appellant] would have to remain in jail because of that charge.

[Appellant's Counsel]: Your Honor, if I may, there hasn't been any evidence introduced to support a WUD conviction, none.

THE COURT: I am not dealing with the WUD at this point. I want to get this verdict and then we are going to deal with the WUD on Tuesday.

[Appellant's Counsel]: That's fine.

(Tr. 575–76.)

Thereafter, the verdicts were read and the jury was polled. Court recessed and resumed the following Tuesday, at which time the following discussion occurred:

THE COURT: * * * The first [issue] is [appellant] waived his right to have a jury trial on Count Two, which is a weapon under disability. And there was a stipulation by counsel that the prosecutor would be allowed to enter certain exhibits that have relevance to that count.

* * * The [other] obligation is to determine whether or not the sentencing of the underlying case, being Counts 1 and 2 with a specification, also include a determination that would be made by the court as regards to whether or not the defendant is a repeat violent offender.

(Tr. 581–82.)

The state offered an exhibit consisting of a certified copy of a prior judgment entry finding appellant guilty of felonious assault with a firearm specification. The state also asked that the trial testimony and exhibits be moved into evidence as to the WUD count.

46

Appellant's counsel stated, "when [the state] rested, his case is over. I think it is totally inappropriate at this point in time to be introducing additional evidence against [appellant]. I think it is inappropriate for the court to consider the WUD at this point in time and a repeat violent offender, as well ." (Tr. 583.) In response, the court stated the record would speak for itself, but because the jury verdict came back late in the day on Friday, the court recessed until Tuesday, the next working day, and this did not constitute a reopening of appellant's case. The court went on to state:

The case was alive and active over the weekend and it resumed this morning. So, there wasn't any foreclosure in the court's mind. I never intended to foreclose the state's right. And, in fact, the state raised the issue of continuing the case on Friday for the presentation.

And my words were something to the effect that the court will take that evidence on [Tuesday]. So I think the record is clear that what we are doing here today is a continuation of what happened on Friday. And there is no reopening of the case that court is facing.

(Tr. 584.)

Appellant recognizes that whether a state's case-in-chief may be reopened for the presentation of further evidence is within the sound discretion of the trial court. *Columbus v. Grant*, 1 Ohio App.3d 96, 97 (10th Dist.1981). Nonetheless, appellant argues double jeopardy principles foreclose the reopening of the prosecutor's case-in-chief after the trial court has ruled on a Crim.R. 29 motion for acquittal and the trial has terminated.

In support, appellant relies on *State v. Lovejoy*, 79 Ohio St.3d 440 (1997). In that case, the defendant waived his right to a jury trial with respect to the WUD charge and the remaining charges were tried to a jury. After being unable to reach a verdict, the trial judge ordered a mistrial due to a hung jury and found the defendant guilty of WUD. Subsequent to the finding of guilty, the trial judge *sua sponte* reopened the evidence to consider evidence of a prior felony conviction. Specifically, the trial judge took judicial notice of the clerk's docket and reaffirmed his finding of guilty on the WUD charge.

The appellate court held it was error for the trial court to *sua sponte* reopen the evidence and take judicial notice of prior proceedings to supply evidence of a fact the state failed to prove. Therefore, the appellate court ordered that the defendant be retried

on the WUD charge. The Supreme Court of Ohio disagreed. The court in *Lovejoy* reviewed the history and purpose of double jeopardy as follows:

It is well established that the Double Jeopardy Clause protects against successive prosecutions for the same offense. *United States v. Dixon* (1993), 509 U.S. 688, 696, 113 S.Ct. 2849, 2855, 125 L.Ed.2d 556, 567. It protects a person who has been acquitted from having to run the gauntlet a second time. *Ashe v. Swenson* (1970), 397 U.S. 436, 445–446, 90 S.Ct. 1189, 1195, 25 L.Ed.2d 469, 476–477. As stated in *Green v. United States* (1957), 355 U .S. 184, 187–188, 78 S.Ct. 221, 223, 2 L.Ed.2d 199, 204:

The underlying idea [embodied in the Double Jeopardy Clause], one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Id.* at 443.

Therefore, the court in *Lovejoy* concluded a retrial on the WUD charge would give the state a "'second bite at the apple'" and that double jeopardy applied to prevent a retrial on said charge. *Id.* at 450.

As our citation to the record reflects, this case presents a scenario significantly different than that presented in *Lovejoy*. To prevail on a double jeopardy claim, a defendant must show there has been an event, such as an acquittal, which terminates the original jeopardy. *State v. Whiteside,* 10th Dist. No. 08AP–602, 2009–Ohio–1893, ¶ 15, citing *Richardson v. United States*, 468 U.S. 317, 325 (1984). In this case, there had not been an event to terminate the original jeopardy on the WUD charge and RVO specification at the time the state submitted evidence of appellant's prior conviction. Rather, the trial court allowed the state to introduce evidence of a charge for which appellant waived his right to a jury and for which there had not yet been a finding made. Therefore, appellant's reliance on *Lovejoy* is misplaced, and we conclude double jeopardy principles do not apply in this instance to bar the court's finding of guilty on the WUD charge and the RVO specification.

Accordingly, appellant's fourth assignment of error is overruled.

*State v. Hunt,* 2013 WL 6406316, at \*16-18.

Petitioner argues that the state appellate court's decision violates *Burks v. United States*, 437 U.S. 1 (1978), which held that the Double Jeopardy Clause precludes a second trial once a reviewing court has found the evidence presented at the first trial to be legally insufficient. "[T]he only 'just' remedy available [in such a case] is the direction of a judgment of acquittal." *Id.* at 17-18.

> The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. This is central to the objective of the prohibition against successive trials. The Clause does not allow "the State . . . to make repeated attempts to convict an individual for an alleged offense," since "[t]he constitutional prohibition against 'double jeopardy' was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense." *Green v. United States*, 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957); *see Serfass v. United States*, 420 U.S. 377, 387–388, 95 S.Ct. 1055, 1061–1062, 43 L.Ed.2d 265 (1975); *United States v. Jorn*, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971).

*Id.* at 11 (footnote omitted).  Referring to *Terry v. Potter*, 111 F.3d 454, 458 (6th Cir. 1997), Petitioner argues that the termination of a trial, even without a conviction or judgment of acquittal, also implicates the Double Jeopardy Clause, because a criminal defendant has a separate but related interest "in avoiding multiple prosecutions even where no final determination of guilt or innocence has been made."  *Reply* (PageID# 1556)(quoting *United States v. Scott*, 437 U.S. 82, 92 (1978).  Petitioner specifically argues that, because he did not expressly agree to bifurcate proceedings, the jury trial's guilty verdict on the related charges precluded the State from introducing any additional evidence against him on the charge of having a weapon while under disability or on the RVO specification.

The Court is not persuaded.

The Double Jeopardy Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V.  The clause has been interpreted as protecting criminal defendants from successive prosecutions for the same offense after acquittal or conviction, as well as from multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165 (1977).  In *Brown,* the defendant was convicted on his guilty plea to a charge of joyriding but was thereafter also convicted of auto theft.  Both convictions were based on the same events and, under Ohio law, joyriding is a lesser included offense of auto theft. Noting that conviction on a charge of joyriding required no proof not required for conviction on a charge of auto theft, the Supreme Court held that the subsequent prosecution on the greater charge was precluded by double jeopardy principles.  *Id.* at 168–69.  The Supreme Court emphasized that the constitutional prohibition on successive prosecutions serves a policy of finality and protects a defendant from the government's attempts to relitigate facts or to secure additional penalties. *Id.* at 165–66.

Petitioner agreed to waive his right to a jury trial on the charge of having a weapon under disability, and to have that charge resolved by the trial judge. *Transcript* (ECF No. 6-2, PageID# 531.)  Ohio law also requires that a specification for a repeat violent offender ("RVO") be resolved by the trial judge.  O.R.C. § 2941.149(B).[4]  The state appellate court rejected

---

[4] The statute further provides:

> At the arraignment of the defendant or as soon thereafter as is practicable, the prosecuting attorney may give notice to the defendant of the prosecuting attorney's intention to use a certified copy of the entry of judgment of a prior conviction as proof of that prior conviction. The defendant must then give notice to the prosecuting attorney of the defendant's intention to object to the use of the entry of judgment. If the defendant pursuant to Criminal Rule 12 does not give notice of that intention to the prosecuting attorney before trial, the defendant waives the objection to the use of

Petitioner's claim under the Double Jeopardy Clause, concluding that no event had taken place "to terminate the original jeopardy on the WUD charge and RVO specification at the time the state submitted evidence of appellant's prior conviction."  2013 WL 6406316, at *18.

In *Serfass v. United States*, 420 U.S. 377 (1975), the United States Supreme Court held that the Double Jeopardy Clause did not preclude the defendant's retrial on charges previously dismissed pursuant to petitioner's pretrial motion to dismiss the indictment, because jeopardy had not attached at the time of the dismissal of the indictment. The Supreme Court explained that the petitioner in that case had not yet been "put to trial before the trier of fact," and the court "was without power to make any determination regarding petitioner's guilt or innocence." *Id*. at 389. In *Ohio v. Johnson*, 467 U.S. at 501, the Supreme Court held that double jeopardy did not bar prosecution on murder and aggravated robbery charges, where the trial court had accepted the defendant's guilty plea to lesser included offenses over the prosecutor's objection.  In *Ricketts v. Adamson*, 483 U.S. 1, 3 (1987), the Supreme Court held that the Double Jeopardy Clause did not bar prosecution of defendant for first degree murder following his breach of a plea agreement pursuant to which he had pleaded guilty to a lesser offense.  More recently, the Supreme Court has held that, where the jury returns irreconcilably inconsistent verdicts of conviction and acquittal, and the convictions are later vacated for legal error unrelated to the inconsistency, the Double Jeopardy Clause does not preclude a retrial.  *Bravo-Fernandez v. United States*, — U.S. —, 2016 WL 6952648, at *10 (Nov. 29, 2016).

---

an entry of judgment as proof of the defendant's prior conviction, as shown on the entry of judgment.

O.R.C. § 2941.149(C).

The cases referred to by Petitioner in support of this claim do not assist him.  In *United States v. Scott*, 437 U.S. 82, the United States Supreme Court held that retrial was not precluded by the Double Jeopardy Clause after the trial judge declared a mistrial because of improper and prejudicial remarks by defense counsel during opening statement. In *Terry v. Potter,* 111 F.3d 454, the United States Court of Appeals for the Sixth Circuit held that the Double Jeopardy Clause prohibited the prosecution from subjecting the defendant to a second trial on intentional murder, after the appellate court reversed his conviction on wanton murder of the same victim and the jury had left blank the verdict form on the issue of intentional murder. The facts presented in those cases are simply inapposite to those presented here.

This Court cannot conclude that the state appellate court unreasonably applied federal law when it held that the Double Jeopardy Clause did not prohibit the submission of additional evidence by the prosecution in connection with the charge of having a weapon while under disability and on the RVO specification, after the jury had begun deliberations on other charges, because those issues had never been presented to the jury for resolution. The jury had no ability to make any determination regarding Petitioner's guilt or innocence in connection with that charge or specification.

Claim four is without merit.

### Claim Five

In claim five, Petitioner alleges that the unauthorized substitution of an alternate juror for a deliberating juror violated his right to have his trial completed by a particular tribunal.  Shortly after the jury had begun its deliberation, Juror Number 7 asked to be replaced by an alternate juror.  On inquiry by the trial judge and by both parties, Juror Number 7 indicated that she was physically affected by the evidence and would not be able to look at the evidence in the case.

The trial court replaced Juror Number 7 without objection by defense counsel and, in accordance with Ohio law, instructed the jury to begin its deliberations anew.  *See State v. Hunt*, 2013 WL 6406316, at *15-16.   The state appellate court rejected Petitioner's claim that, in doing so, the trial court had violated Petitioner's constitutional right.

Petitioner argues that the trial court violated *Crist v. Bretz*, 437 U.S. 28, 35 (1978), and *Wade v. Hunter*, 336 U.S. 684, 689 (1949), taking the position that the trial court's substitution of Juror Number 7 was arbitrary and unreasonable because the juror's expressed reluctance to continue her service as a juror did not constitute a compelling justification for her removal from the jury.  In *Crist v. Bretz*, 437 U.S. 28, and *Wade v. Hunter*, 336 U.S. 684, the Supreme Court discussed a defendant's constitutional right to a complete trial by a particular tribunal, and the interplay of that right and the Double Jeopardy Clause:

> The reason for holding that jeopardy attaches when the jury is empaneled and sworn lies in the need to protect the interest of an accused in retaining a chosen jury. That interest was described in *Wade v. Hunter,* [336 U.S. 684 (1949)], as a defendant's "valued right to have his trial completed by a particular tribunal." 336 U.S. at 689, 69 S.Ct. at 837. It is an interest with roots deep in the historic development of trial by jury in the Anglo-American system of criminal justice. Throughout that history there ran a strong tradition that once banded together a jury should not be discharged until it had completed its solemn task of announcing a verdict.
>
> Regardless of its historic origin, however, the defendant's "valued right to have his trial completed by a particular tribunal" is now within the protection of the constitutional guarantee against double jeopardy, since it is that "right" that lies at the foundation of the federal rule that jeopardy attaches when the jury is empaneled and sworn. *United States v. Martin Linen Supply Co., supra; Serfass v. United States, supra*, 420 U.S. 377, at 388, 95 S.Ct. 1055, at 1062, 43 L.Ed.2d 265; *Illinois v. Somerville*, 410 U.S., at 467, 93 S.Ct., at 1072, 35 L.Ed.2d 425; *United States v. Jorn*, 400 U.S. 470, 478-480, 484-485, 91 S.Ct. 547, 553-554, 556-557, 27 L.Ed.2d 543 (plurality opinion).

*Id.* (footnotes omitted).[5]  However, Petitioner has referred to, and this Court is aware of, no decision of the United States Supreme Court holding that a trial court violates the Constitution by permitting, during the course of deliberations, the substitution of a juror with an alternate juror under the circumstances presented here.  "[T]he AEDPA expressly limits the source of law to cases decided by the United States Supreme Court."  *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).   Before granting habeas corpus relief, a federal court must find a violation of law "'clearly established' by holdings of the Supreme Court, as opposed to its *dicta*, as of the time of the relevant state court decision."  *Id.* (citing *Williams,* 529 U.S. at 413.  A federal habeas court may not look to the decisions of the lower federal courts in determining whether a state court has contravened or unreasonably applied clearly established federal law under 28 U.S.C. 2254(d).  *Id.* (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

To the extent that Petitioner intends to raise a claim regarding the alleged violation of state law, such claim fails to provide a basis for relief.  A federal court may review a state prisoner's habeas petition only if the petitioner's challenge to his confinement is predicated on an alleged violation of the Constitution, laws or treaties of the United States. 28 U.S.C. § 2241(c)(3); § 2254(a). Thus, a federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law."  *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988).

Further, the record does not support Petitioner's argument that the trial court acted in an arbitrary or unreasonable manner.  Juror No. 7 expressed an aversion to continue and asked to be replaced.  She stated that the evidence in the case was having a negative physical effect on her.

---

[5] Petitioner also refers to *Hinton v. United States*, 979 A.2d 663, 682 (D.C. App. 2009)(*en banc*), in support of this claim.  *See Reply* (ECF No. 12, PageID# 1558.)    *Hinton* addressed only the interpretation and application of a rule of the Superior Court for the District of Columbia governing the substitution of a deliberating juror over the objection of the defendant.  *Hinton* is not applicable to the facts of this case.

*Transcript* (ECF No. 6-4, PageID# 1092-97.)   Moreover, counsel did not object to the trial

court's proposed solution.  Arguably, the doctrine of invited error now precludes Petitioner from

doing so here.  *See West v. Kelley*, No. 2:09-cv-93, 2010 WL 2465334, at *14 (S.D. Ohio June

14, 2010)("When a criminal defendant invites an error in the trial court, he is precluded from

seeking habeas corpus relief for that error.")(citing *Randolph v. Wolfenbarger,* No. 04-cv-73475-

DT, 2006 WL 1662885 (E.D. Mich. June 12, 2006)(citing *Fields v. Bagley*, 275 F.3d 478, 485–

86 (6th Cir. 2001); *Draughn v. Jabe*, 803 F.Supp. 70, 75 (E.D. Mich. 1992)(citing *Leverett v.

Spears*, 877 F.2d 921, 924 (11th Cir. 1989)).

Claim five is without merit.

## Recommended Disposition

For the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be

**DISMISSED.**

## Procedure on Objections

If any party objects to this *Report and Recommendation*, that party may, within fourteen

days of the date of this Report, file and serve on all parties written objections to those specific

proposed findings or recommendations to which objection is made, together with supporting

authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those

portions of the report or specified proposed findings or recommendations to which objection is

made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or

in part, the findings or recommendations made herein, may receive further evidence or may

recommit this matter to the magistrate judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and

Recommendation* will result in a waiver of the right to have the district judge review the *Report*

*and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


   *s/ Norah McCann King*
Norah McCann King
United States Magistrate Judge
December 13, 2016